760

Belknap
No. 85-510

THURSTON ENTERPRISES, INC.

v.

LAWRENCE BALDI, SR.

LAWRENCE BALDI, SR.

v.

THURSTON ENTERPRISES, INC. AND A. DONALD THURSTON

December 5, 1986

*Murphy, McLaughlin & Hemeon*, of Laconia (*Matthew J. Lahey* on the brief and orally), for the plaintiff.

*Decker, Fitzgerald & Sessler*, of Laconia (*David R. Decker* on the brief and orally), for the defendant.

BATCHELDER, J. This case presents cross appeals from the determination by a Master (*Mayland H. Morse, Jr.*, Esq.), approved by the Superior Court (*O'Neil*, J.), of the parties' rights and duties in an easement. For the reasons that follow, we affirm in part, vacate in part, and modify in part.

Thurston Enterprises, Inc. ("Thurston") petitioned to enjoin Lawrence Baldi ("Baldi") from blocking the easement and to compel Baldi to remove or alter certain permanent obstacles. Baldi counterclaimed for $500,000 damages and for permanent revocation of the easement. The trial court severed the claims for damages. The master heard testimony and made his own observation of the site. He made the following findings of fact, which the parties do not dispute.

Thurston operated a marina. On adjoining property, Baldi operated a drive-in movie theater. In 1978, Baldi sold part of his land to Thurston. The transferred land was rocky, steep, and covered with slash. Baldi knew Thurston planned to develop the land into parking and boat storage facilities for the marina. Although there is now an alternative access, the only way vehicles could reach it at the time Baldi sold the land was to travel over Baldi's drive-in theater. Consequently, Baldi deeded Thurston an easement across the theater.

The easement is a fifty-foot-wide specified course. It begins at the theater entrance on Route 3, passes under the theater marquee, continues past the ticket booth, which sits roughly in the center of the right of way, and crosses the theater lot to Thurston's parcel. The ticket booth and the marquee, which was less than ten feet high, were preexisting and, of course, openly visible structures, but they were neither mentioned in the deed nor drawn on the subdivision map. At the time of the easement grant, most of the right of way, along with much of the rest of the patron parking area, was paved with a light asphalt "farm mix" on a three inch sand base. Although this farm mix was beginning to deteriorate after several years of use, it was adequate for the theater traffic. The deed subjected the easement to three limitations, only the first of which is significant in the present controversy. Limitation A reads: "The easement granted herein shall not interfere with the Grantor's use of the property subject to the easement."

In the spring of 1979, Thurston began using the easement to truck fill into his parcel. The light paving was not designed for heavy truck traffic. Furthermore, the paving was especially vulnerable in the spring, when frost melt destabilized the sand bed and water puddled deeply on the surface. The ten-wheel trucks were too high to pass under the marquee and too wide to stay on the right of way as it deflected around the ticket booth. Consequently, Thurston's

trucks swung around the marquee and deviated from the right of way into speaker aisles 1–3. The trucks destroyed the pavement and caused deep ruts in the earth, both in the right of way and in the speaker aisles. This pattern was repeated in the spring of 1980 and again in the spring of 1984. In 1984, after Baldi was unsuccessful in persuading Thurston to cease driving heavy trucks across the right of way, Baldi blocked the entrance to the right of way with a pick-up truck. Thurston's petition and Baldi's counter-petition followed.

The master concluded that, at the time of the conveyance, neither party contemplated such extensive use of heavy trucks. He found that Thurston had caused the destruction of the surface and sub-surface of the right of way by using the easement unreasonably and by enlarging upon the granted easement. Accordingly, he ordered Thurston to repave the right of way. Specifically, he recommended that Baldi was not entitled to a revocation of the easement, nor could Baldi insist that Thurston use the new, alternative access. On the other hand, the master found that Baldi had no duty to relocate the preexisting marquee and ticket booth. Thurston was ordered to repair the speaker aisles, limit his trucks to no more than five per day, and to rebuild the rutted right of way. The master recommended the rebuilt right of way have a sub-base of one foot of bank-run gravel and a base of six to nine inches of crushed gravel compacted to receive a surface layer of three to six inches of asphalt concrete paving mixed with different sized aggregates. This construction is approximately equal to the paving specifications for federal highways. Since the master believed the new paving would be an improvement constituting a betterment for Baldi, he recommended that two-thirds of the reconstruction be paid for by Thurston and one-third by Baldi.

On appeal, Baldi contends he has no duty to share the cost of reconstruction. Additionally, in oral argument, we asked Baldi's attorney to discuss the alternative access, although he had not briefed a claim that the easement should be revoked. Thurston makes seven arguments, which can be grouped into four classes: that he is entitled to removal of the marquee and ticket booth; that restoring the speaker lanes and the right of way is an assessment of damages beyond the scope of equity jurisdiction; that the restriction to five trucks per day was arbitrary and an abuse of discretion; and that he cannot be required to put the right of way into a better condition than it was when it was conveyed to him, either by upgrading the paved portions or by paving the unpaved portions.

We affirm in part, and modify in part, but vacate rulings on several issues that should properly be resolved by the trial for

damages. An easement grants only a nonpossessory interest in land, *Waterville Estates Assoc. v. Town of Campton*, 122 N.H. 506, 508, 446 A.2d 1167, 1168 (1982); that is, a limited right to use but not possess the conveyed land. The grantee of the easement, who is the possessor of the dominant estate, must use the easement reasonably, *Sakansky v. Wein*, 86 N.H. 337, 341, 169 A. 1, 3 (1933), so as not to damage the possessory interest of the grantor, who is the possessor of the servient estate upon which the easement lies, *Donaghey v. Croteau*, 119 N.H. 320, 324, 401 A.2d 1081, 1084 (1979). Injunctive actions, such as the present claim and counterclaim, look to prevent future conduct rather than to remedy past conduct. *Holland v. Amoskeag Mach. Co.*, 44 F. Supp. 884, 888 (D.N.H. 1942). Thus, injunctions issue only to prevent imminent irreparable harm. *Murphy v. McQuade Realty, Inc.*, 122 N.H. 314, 316, 444 A.2d 530, 532 (1982). Because the separation between law and equity is not sharp, courts in New Hampshire have broad discretion in exercising equity jurisdiction, *Sands v. Stevens*, 121 N.H. 1008, 1011, 437 A.2d 297, 300 (1981). Nonetheless, equitable jurisdiction lies only when there is no plain and complete remedy at law, *id.* Applying these jurisdictional rules to easements, in an equitable action to determine the scope of rights in an easement, the remedy will ordinarily be limited to future conduct affecting the reasonable use of the easement and possession of the servient estate.

■ Thus, because the orders to repair look to remedy the effects of past conduct, we vacate them. Those issues involve legal questions of damage. In the present circumstances, reparation is not the same as restitution. We respectfully advise the superior court to allow the parties to litigate these damage issues in the severed action, with leave to amend their pleadings if necessary. We emphasize, however, that our decision to vacate these rulings does not mean Thurston has no prospective duty to maintain the right of way.

Thus, our inquiry focuses on three remaining issues. First, may Thurston still use the easement, in light of the alternative access? Second, if he may, do Baldi's marquee and ticket booth improperly restrict Thurston's reasonable use? Third, were the master's recommendations concerning future truck traffic and right of way improvement erroneous as to what constitutes reasonable use?

■ When Thurston purchased the back acreage from Baldi, it was inaccessible to vehicles except through Baldi's land. Had Thurston not paid for an easement, equity would have implied one by necessity, although the implied easement might have been over a different course. *Kimball v. Cochecho Railroad Co.*, 27 N.H. 448, 454 (1853). Nonetheless, the parties created an express easement by

deed. Thus, the question is whether an easement given by deed, where it could have arisen purely by necessity, will be extinguished when the necessity abates. To ask the question is to answer it: the parties' rights are controlled by the deed. *Crocker v. Canaan College*, 110 N.H. 384, 387, 268 A.2d 844, 847 (1970). Thus, Thurston's easement remains even after the necessity passes.

██ The deed also controls the remaining questions. The meaning of a deed is ultimately a matter of law for this court to decide. *Robbins v. Lake Ossipee Village, Inc.*, 118 N.H. 534, 536, 389 A.2d 940, 941 (1978). In interpreting a deed, we give it the meaning intended by the parties at the time they wrote it, taking into account the surrounding circumstances at that time. *Id.* at 536, 389 A.2d at 942; *Chao v. The Richey Co., Inc.*, 122 N.H. 1115, 1117, 455 A.2d 1008, 1010 (1982). Thurston purchased the right of way with full knowledge of the marquee and ticket booth. He purchased subject to a limitation that his use not interfere with Baldi's use. Baldi knew Thurston intended to use the back lot for boat storage, but did not know, nor is it reasonable to expect him to have known, that Thurston would truck large volumes of fill across the easement. Similarly, Baldi did not know, nor should he have known, that Thurston intended to transport boats using fork lifts taller than the marquee.

██ These circumstances distinguish the case from *White v. Hotel Co.*, 68 N.H. 38, 34 A. 672 (1894), which Thurston argues controls this case. In *White*, the deed creating the easement made no mention of any obstruction. We declared: "The parties knew the situation. If their intention was that the obstruction should be permanent and irremovable, they naturally would, as they easily might, have expressed such intention." *Id.* at 42, 34 A. at 673. In our case, Thurston is limited by his grant to uses that do not interfere with Baldi's, unlike the grantee in *White*, who could pass with any manner of vehicle. In *White*, "[t]he natural meaning of the language of the deed [was] inconsistent with the existence of an impassable gulf across the way." *White, supra* at 42, 34 A.2d at 673. In contrast, the existence of the marquee and the ticket booth is not inconsistent with trucking fill and boats across Baldi's lot, or at least it cannot be said that Baldi knew or should have known it to be inconsistent. Furthermore, the obstruction in *White* was total. The grantee in *White* could make no use at all of the easement, yet the deed expressly stated that he could pass through "on foot and with all kinds of teams and vehicles." *White*, 68 N.H. at 42, 34 A.2d at 673. Thurston's way is only partially obstructed. He can pass with slightly smaller trucks. In light of the fact that Thurston knew of the marquee when he purchased the easement, the fact that trans-

port with smaller trucks costs more does not swing the balance of equity so much in Thurston's favor that Baldi should have to remove the ticket booth or raise the marquee. We have recognized in previous cases that equity requires a balancing of the consequences of granting relief against the need for granting it, *Gerrish v. Wishbone Farm*, 108 N.H. 237, 239, 231 A.2d 622, 624 (1967), but the "mere fact that a wrongdoer may suffer will not of itself deter equity from granting relief to an injured party." *Crocker, supra* at 388, 268 A.2d at 847. In conclusion, we affirm the lower court's order that Baldi may keep the marquee and ticket booth as they are.

██ We turn now to the issue of traffic limits and right of way construction. We begin by repeating that an easement created by deed is always limited to a reasonable use. Here the legal implication of reasonableness is reinforced by the express limitation restricting Thurston to non-interfering use. Thurston points us to several cases which he claims hold that the grantee of an easement may use the easement as is necessary to develop his own estate; *e.g.*, *Sakansky*, 86 N.H. at 341, 169 A. at 3; *White, supra* at 43, 34 A. at 674; *Smith v. Wiggin*, 52 N.H. 112, 118 (1872). We emphasize that these cases all limit the user to that which is reasonably necessary. There is no dichotomy in our law, with some cases mandating reasonable use; *e.g.*, *Delaney v. Gurrieri*, 122 N.H. 819, 821, 451 A.2d 394, 396 (1982); *Donaghey*, 119 N.H. at 324, 401 A.2d at 1084; *Sandown v. Kelley*, 97 N.H. 418, 419–20, 89 A.2d 758, 759 (1952), and other cases permitting any use necessary to develop the dominant estate. Such a contradictory state of the law cannot and does not exist. Thurston must use the easement reasonably.

██ ██ The master found, upon ample evidence, that Thurston's truck traffic had severely damaged the right of way and other areas of Baldi's property. There was evidence that Baldi was unable to operate his theater with the property in its damaged condition, and on at least one occasion delayed opening his theater until he repaired the paving. We have previously held that "[t]he owner of an easement cannot materially increase the burden of it upon the servient estate[.]" *Crocker*, 110 N.H. at 387, 268 A.2d at 847. It is, thus, beyond argument that destruction of the underlying fee property by the user of an easement is unreasonable. The master attempted to enjoin such destruction by limiting Thurston's truck traffic to five daily trips. We believe imposing an exact limit is unnecessary. Furthermore, having limited the volume of traffic, it was unreasonable for the master to require Thurston to reconstruct the right of way so that it would bear the former volume of traffic. Instead, we believe it appropriate that Thurston be required to put the entire

right of way into a condition commensurate with whatever traffic he brings on it or at least into its original condition at the time of the conveyance, subject to his reasonable use.

While this might leave the right of way better than when Baldi granted the easement, it is not a betterment which Baldi must pay for. He receives no benefit from the improvement. In effect, to require Baldi to contribute to the cost of Thurston's improvements would be to require Baldi to subsidize Thurston's enterprise. This the grantor of an easement has no obligation to do. In *Maddock v. Chase*, 94 N.H. 241, 242–43, 51 A.2d 145, 146–47 (1947), we analogized common occupancy of a building to easements and held that an owner of one part of the commonly occupied building had no equitable duty to maintain or repair his part so as not to cause harm to the part owned by another common tenant. In *Maddock*, we also cited a case holding that, in the absence of a contractual obligation, the owner of a dam has no duty to maintain the dam for one who has a right to draw water from the pond behind it. *Id.* at 244, 51 A.2d at 147–48 (citing *Cole v. Fred B. Pierce Co.*, 79 N.H. 187, 106 A. 605 (1919)). If the grantor of a right of use has not even the duty to maintain, he certainly has no duty to subsidize. Thus, Thurston must bear the entire cost of any improvements he makes to the right of way.

*Affirmed in part; modified in part; vacated in part; remanded.*

All concurred.